James R. **GROVE**, Lonnie, J. Wojtkowiak, Dennis S. Krone, Bruce Evan Murch, Aaron J. Murch, Benjamin J. Murch, Lauren D. Murch, Samuel Gibson Murch, Kathryn Y. Riley, Daniel D. Riley, Plaintiffs

v.

**CITY OF YORK, PENNSYLVANIA;** Officers Russell E. Tschopp, III, Kim Hibner, Eddie Lowe; and Roger Nestor, in their individual and official capacities, Defendants

No. CIV. 1:CV–03–198.

United States District Court, M.D. Pennsylvania.

June 9, 2004.

James Ralph Grove, Seven Valleys, PA, pro se.

Lonnie James Wojtkowiak, Seven Valleys, PA, pro se.

Dennis S. Krone, Dover, PA, pro se.

Bruce Evan Murch, Red House, VA, pro se.

Aaron J. Murch, Red House, VA, pro se.

Benjamin J. Murch, Red House, VA, pro se.

Lauren D. Murch, Red House, VA, pro se.

Samuel Gibson Murch, Red House, VA, pro se.

Kathryn Y. Riley, Spring Grove, PA, pro se.

Daniel D. Riley, Spring Grove, PA, pro se.

James D. Young, Lavery, Faherty, Young & Patterson, P.C., Harrisburg, PA, for Defendants.

### MEMORANDUM

RAMBO, District Judge.

Before the court are the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. The parties have briefed the issues, and the matters are ripe for disposition.

### I. *Background*

The instant case is a civil rights action brought pursuant to 42 U.S.C. § 1983 wherein Plaintiffs allege that Defendants violated their First and Fourteenth Amendment rights of free speech, freedom of assembly, and free exercise of religion.

The following facts are undisputed unless otherwise noted.[1] Plaintiffs are individuals who practice Christianity and whose sincerely held religious beliefs require them to preach publicly "in order to make the public aware of sin, including the sin of Halloween and of abortion." (Pls.' Sep. Stat. of Mat. Facts ¶ 3.) Plaintiffs exercise their religious beliefs by traveling to events across the country that draw large numbers of people in order to preach to crowds gathered at these events, to hand out tracts containing religious exhortations and to display signs containing, among other things, pictures of aborted fetuses. Defendants Russell Tschopp III, Kim Hibner, Eddie Lowe, and Roger Nestor are officers of the Police Department of the City of York (collectively "the Individual Defendants"). All of the Individual Defendants have had, at the time of their training at the police academy, training in the area of free speech rights. Defendant City of York ("the City") is a municipal corporation organized and existing under the laws of the Commonwealth of Pennsylvania.

As a part of its municipal authority, the City has enacted a Parades and Street Fairs Ordinance (Article 505 of the Codified Ordinances of the City of York), which provides that under and subject to the provisions of that Article, it is lawful to hold parades on the streets, sidewalks and highways of the City. Pursuant to § 505.02, parades and street fairs may be held only by organizations or groups of individuals banded together for such purpose and only after permit for the holding

---

1. The court notes that Defendants did not file a counter statement of material facts in response to the Separate Statement of Material Facts filed by Plaintiffs. Local Rule 56.1 states that all material facts set forth by a moving party "will be deemed to be admitted unless controverted by the statement required to be served by the opposing party." M.D. Local Rule 56.1. Accordingly, to the extent that any of the material facts set forth in Plaintiffs' Separate Statement of Material Facts are not implicitly controverted by Defendants' Statement of Material Facts in support of their motion for summary judgment, the court will deem them admitted.

thereof has been granted by the Mayor. Pursuant to § 505.09, no person or group is permitted to hold a parade or street fair on the streets, sidewalks and highways of the City of York or knowingly participate in any such parade unless a permit has been obtained. Section 505.10 of the Parade and Streets Ordinance also prohibits anyone from knowingly joining or participating in any parade or street fair conducted under a permit from the Mayor in violation of any terms of such permit, or knowingly joining or participating in any parade without the consent of the permittee.

On October 27, 2002, the City held its annual Halloween Parade ("the Parade") on a blocked off portion of Market Street between Richland Avenue and Lehman Street. The Parade was sponsored by Shipley Energy and the York City Recreation and Parks Bureau. Prior to the Parade, the City issued General Regulations that provided that anyone wishing to participate in the Parade must complete an application, that entries would not be permitted on the day of the Parade, and that no political entries of any kind would be permitted.

On the day of the Parade, Plaintiffs came to the Parade assembly grounds with the intention of "preaching the Word of God, displaying signs containing Bible verses, and displaying signs depicting aborted fetuses for the purpose of warning all listeners of the sin of abortion." (Pls.' Sep. Stat. of Mat. Facts ¶ 9.) Plaintiffs did not have a permit to march in the Parade, and they did not notify the City or the permittee of their desire to enter the Parade or walk the Parade route. Since the City blocked off Market Street, members of the public were mingling in the street before the Parade came through. Plaintiffs walked along the route prior to the Parade starting. As they walked along the street, Plaintiffs preached, handed out literature and held various signs denouncing abortion, including five signs depicting aborted fetuses.

On the day of the Parade, Defendant Hibner was at the corner of Market and Pine Streets doing traffic and crowd control. She observed Plaintiffs coming down the street in a group of approximately twenty to thirty people. Hibner assumed that the Parade had reached her intersection and that she needed to close the intersection. At this point, Hibner heard on the radio that the Parade had not yet reached her and that Plaintiffs were not a part of the Parade. Hibner was also told that other officers along the Parade route were getting complaints from the crowd about Plaintiffs' signs depicting aborted fetuses. Until this point, however, there had been no confrontations between Plaintiffs and anyone in the crowd although there were a few hecklers. The parties disagree about what happened next.

Plaintiffs assert that Hibner told Plaintiffs to get off the street and they complied. (Pls.' Sep. Stat. of Mat. Facts ¶ 20; Hibner Dep. at 10–11.) Defendants assert that Hibner first radioed Defendant Tschopp, her supervising officer, and that he told Hibner to remove Plaintiffs from the street. (Defs.' Concise Stat. Mat. Facts ¶ 23; Tr. of Proceedings, Pl. Grove's Crim. Trial at 90; Hibner Dep. at 9–11.) In any event, the parties agree that Hibner ordered Plaintiffs to get onto the sidewalk. While she was doing this, Plaintiff Riley, who was twelve-years old at the time, approached Hibner. According to Defendants, Hibner interpreted this as "an aggressive move" that required Hibner to physically escort Riley onto the sidewalk. (Defs.' Concise Stat. Mat. Facts ¶ 23; Hibner Dep. at 11–13.) Plaintiffs, on the other hand, assert that Hibner pushed Riley without provocation and that the other

members of Plaintiffs' group became upset by Hibner's actions.

After arranging for Plaintiffs to get off the street and onto the sidewalk at various corners of the intersection, Hibner again called Defendant Tschopp for advice and indicated that she needed additional officers at the intersection. While Defendant Hibner was making this call, some of the spectators who were at the intersection to watch the Parade began yelling at Plaintiffs because of the signs depicting aborted fetuses. These spectators yelled, among other things, that they did not want their children to see these signs. At this point a verbal altercation occurred between some members of Plaintiffs' group and members of the crowd. As this was happening, Defendants Lowe, Nestor and Tschopp arrived at the scene. At the time of their arrival, the hostility between the crowd and Plaintiffs' group was minimal.

Defendants further argue that Defendant Tschopp attempted to reason with Rev. Grove and explained to him that he was not allowed to be on the enclosed parade route, "but his behavior and the behavior of others in his group was disorderly and harassing (signs were being shoved into peoples [sic] view and traps [sic] were thrown into the laps of individuals who did not want them)." (Br. in Supp. of Defs.' Mot. for Summ. J. at 11; *see also* Tr. of Proceedings, Pl. Grove's Crim. Trial at 100, 122–23.)

While Plaintiffs' group was on the sidewalk, it became apparent that many members of the crowd were visibly upset by Plaintiffs' signs depicting aborted fetuses. As the shouting between Plaintiffs and members of the crowd escalated, various Defendants voiced their opinion as to the root of the problem. For instance, Defendant Nestor spoke to several people in Plaintiffs' group who were holding the signs depicting aborted fetuses and explained that those signs were causing the

problem. Defendant Nestor stated that if Plaintiffs would cover up their signs, it would help ease the tension and Plaintiffs would be permitted to continue on the Parade route. (Nestor Dep. at 14–15.) In addition to Defendant Nestor, Defendants Hibner and Tschopp also indicated that the signs depicting the aborted fetuses were the cause of the problem.

Plaintiffs assert that in an effort to remedy the problem, Defendant Tschopp and Defendant Nestor told Plaintiffs' group that if they gave up the signs with the pictures of the aborted fetuses, they would be allowed to continue down the Parade route. (Tr. of Proceedings, Pl. Grove's Crim. Trial at 306, 316, 422–23; Nestor Dep. 15.) Defendants, on the other hand, argue that Defendant Tschopp informed Plaintiffs that if they surrendered the pictorial signs, Plaintiffs' group would be permitted to walk down the side walk. (Defs.' Concise Stat. Mat. Facts ¶ 42; Tr. of Proceedings, Pl. Grove's Crim. Trial at 149–50.) Plaintiffs refused to surrender their signs, and Defendants refused to permit them to continue on the Parade route with their signs.

While on the sidewalk, the hostilities between Plaintiffs' group and the crowd increased. At one point, a group from the crowd placed large sheets in front of Plaintiffs' signs in an attempt to obstruct the signs from view. Defendant Tschopp believed that the pictorial signs were the source of the problem. As such, he departed from the scene and went to speak with his supervising officer, Lieutenant Veseth. Defendant Tschopp recommended to Veseth that the officers confiscate the signs because he believed that was the only way to de-escalate the situation. When Tschopp returned to the scene, he informed the other officers that Veseth and he determined that they should confiscate the signs depicting aborted fe-

tuses because there were too many people complaining and the situation was getting out of hand. After stating this, the Individual Defendants confiscated Plaintiffs' pictorial signs depicting aborted fetuses but allowed Plaintiffs to keep their other signs that merely contained religious exhortations against abortion. After confiscating the pictorial signs, Defendant Tschopp placed them into his police car and drove away. Plaintiffs were permitted to re-enter the street and continue preaching and handing out literature along the Parade route without their pictorial signs.

The parties agree that but for the fact that the Parade was happening the streets would not have been closed and Plaintiffs would not have been able to walk down Market Street distributing literature and preaching. The parties also agree that Plaintiffs did not have a parade permit for that day nor had they applied for permission to be a part of the group that did have a parade permit for that day. Defendants admit that in the past, Plaintiff Grove and other anti-abortion protestors were permitted to precede the Halloween Parade down Market Street even if these groups did not have a parading permit. Both Defendants Tschopp and Nestor admitted that there probably would not have been any further confrontation between Plaintiffs and the crowd if Plaintiffs would have been permitted to continue walking down the street with their signs instead of being stopped on the sidewalk by Defendants. The signs confiscated belonged to Plaintiff Bruce Murch. Because they were confiscated, Murch was unable to use those signs in later protests and was forced to purchase replacement signs at a cost of $100 per sign.

After the incident, the City's Police Chief instructed Tschopp to consult with the York County District Attorney for legal advice on whether to criminally charge Plaintiffs. After receiving advice from the District Attorney's office and direction by the City's Chief of Police, Defendant Tschopp filed a criminal complaint against Plaintiff Grove charging him with (1) misdemeanor disorderly conduct; (2) harassment, a summary offense; and (3) summary offense violations of subsections 505.02 and 505.10 of the York Parades and Street Fairs Ordinances. In support of the criminal charges against Plaintiff Grove, Defendant Tschopp filed an affidavit of probable cause setting forth his version of the events listed above. Following a preliminary hearing before a District Justice, Grove was bound over for trial. A trial was conducted on September 11–12, 2003. A jury acquitted Grove on the misdemeanor disorderly conduct charge and the remaining charges were dismissed by the trial judge.

Following the Parade and before Defendant Tschopp initiated criminal charges, an attorney representing Plaintiffs sent a letter to the City's mayor and the City's Chief of Police. That letter asked Defendants to apologize for the confiscation of the signs, return the signs, pay rental of $25 per day per sign, and issue a statement to the press that the confiscation was wrong. None of the Defendants ever responded to the letter and Tschopp was told to put together a list of witnesses in the event that there was a civil action. Plaintiffs allege that the City conducted no training in response to this letter. Plaintiffs assert that none of the Defendants had any training in the area of free speech rights apart from the minimal amount they received at the police academy.

In 2003, Grove applied for and was issued a permit to participate in the 2003 Halloween Parade. The City informed Grove and the public via a press release that Grove had a constitutional right to distribute material. (*See* City Press Release, Attach. as Ex. N to Pls.' Mem. in

Supp. of Mot. for Summ. J.) As a result of the 2002 Halloween Parade and the City's press release, there was significant publicity concerning the 2003 Halloween Parade. In light of that publicity, Grove requested that appropriate protection be provided so that he could communicate his message. On the day of the 2003 Halloween Parade, the City's solicitor informed Grove on behalf of the City that while he could march in the parade and distribute literature, he could not display pictures of aborted fetuses because the City feared violence. The City's solicitor told Grove that if he tried to march with those pictures, he would be arrested. Grove did not march in the 2003 parade because he was unable to display his signs, although Plaintiff Murch and his family again walked Market Street in advance of the 2003 parade carrying signs depicting aborted fetuses. Murch did not have a permit to parade that day, and he was informed by the City's solicitor that he could not continue on the parade route with the pictures.

The parties have filed cross-motions for summary judgment. Those motions have been fully briefed and are ready for disposition.

## II. *Legal Standard: Summary Judgment*

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231–32 (3d Cir.2001). A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis which would allow a rea-

sonable fact-finder to return a verdict for the non-moving party. *Id.* at 249, 106 S.Ct. 2505. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Gans v. Mundy*, 762 F.2d 338, 341 (3d Cir.1985); *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D.Pa.1992).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, and designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial." *Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548. " 'Such affirmative evidence—regardless of whether it is direct or circumstantial—must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.' " *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir.1989)).

The standards governing the court's consideration of Federal Rule 56(c) cross-motions are the same as those governing motions for summary judgment, although the court must construe the motions independently, viewing the evidence presented by each moving party in the light most favorable to the nonmovant. *Raymond*

*Proffitt Found. v. U.S. Envtl. Prot. Agency,* 930 F.Supp. 1088, 1096 (E.D.Pa.1996).

### III. *Discussion*

In three counts, Plaintiffs' Second Amended Complaint asserts a cause of action under 42 U.S.C. § 1983 for a violation of Plaintiffs' First and Fourteenth Amendment rights of free speech, free assembly and the free exercise of religion. Plaintiffs request both monetary damages and injunctive relief on their claims. Specifically, Plaintiffs request a declaratory judgment stating that Defendants' actions of prohibiting Plaintiffs from preaching, displaying signs, and handing out literature along Market Street in York in advance of the Halloween Parade are invalid under the United States Constitution. Plaintiffs also request that the court issue a permanent injunction restraining Defendants from: (1) prohibiting Plaintiffs from preaching, displaying signs, and handing out literature; (2) threatening Plaintiffs with penalties for preaching, displaying signs and handing out literature; and (3) restraining Defendants from confiscating Plaintiffs' signs. Furthermore, Plaintiffs request the court to award damages for Defendants' confiscation of Plaintiffs' signs and for the time and cost of defending criminal charges arising out of the exercise of their First and Fourth Amendment rights.

Defendants argue that they are entitled to judgment as a matter of law on these issues because there are no genuine issues of material fact and Plaintiffs have failed to demonstrate a violation of the First Amendment. Specifically, Defendants argue that their restraint on Plaintiffs' speech constituted a reasonable time, place and manner restriction. Defendants further argue that even if their actions violated Plaintiffs' First Amendment rights, the Individual Defendants are entitled to qualified immunity because a reasonable police officer, under the circumstances, would not have known that their actions violated clearly established rights. Finally, Defendants argue that the City is entitled to summary judgment because Plaintiffs have failed to demonstrate the Individual Defendants acted pursuant to an official government policy or practice or that there was any municipal action.

Plaintiffs agree that there are no genuine issues of material fact but argue that they are entitled to judgment as a matter of law. Specifically, Plaintiffs argue that Defendants' actions violated Plaintiffs' constitutional rights, namely their rights to free speech, assembly, and exercise of religion. Plaintiffs' further argue that the Individual Defendants are not entitled to qualified immunity because a reasonable police officer would have realized that making content-based decisions about which speech to suppress violated Plaintiffs' constitutional rights. Finally, Plaintiffs argue that they are entitled to judgment as a matter of law against the City because it engaged in a policy of deliberate indifference to Plaintiffs' constitutional rights.

In light of the fact that the parties have filed cross-motions for summary judgment, the court will address the merits of each motion as it applies to the corresponding counts in Plaintiffs' Amended Compliant. For the reasons that follow, the court will deny in part and grant it in part each parties' motion for summary judgment.

### A. *First Amendment Violations: The Individual Defendants*

Given the different interpretations posited by the parties, the court must first establish the scope of the controversy before it. Defendants cast the case in terms of a parade permit holder having the ability to exclude whomever they choose. To that end, Defendants cite *Hurley v. Irish–American Gay, Lesbian, and Bisexual*

*Group of Boston,* 515 U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995). In that case, the Supreme Court ruled that forcing organizers of a St. Patrick's Day parade to include a group of gay, lesbian, and bisexual descendants of Irish immigrants would violate the fundamental rule of protection under the First Amendment that the speaker has the autonomy to choose the content of his own message. *See id.* at 572–73, 115 S.Ct. 2338. Plaintiffs argue that Defendants' emphasis is misplaced because Defendants presented no evidence that a private parade organizer wished to exclude Plaintiffs. Moreover, Plaintiffs argue that the right of a private parade organizer to choose their message does not extend to the right of police officers to confiscate signs that they or the public find offensive. The court agrees.

Plaintiffs do not present a facial or factual challenge to the City's parade ordinance, nor do they assert that they should have been included in the Parade. The gravamen of Plaintiffs' Second Amended Complaint is that certain actions taken by Defendants on the day of the Parade deprived them, as members of the general public, of certain federal rights. The dispute between the parties is whether Defendants' refusal to permit Plaintiffs from marching with certain pictorial signs and Defendants' confiscation of said signs, as well as Plaintiff Grove's subsequent prosecution were proper under the First Amendment's speech, assembly and free exercise clauses. Plaintiffs' argue that Defendants' actions were a content-based restriction that served no significant government interest, did not leave open alternative channels for communication and was not narrowly tailored. Plaintiffs neither allege that they were impermissibly denied a parade permit nor that they were

impermissibly denied permission to parade with the Parade's permit holder, Shipley Energy. Rather, Plaintiffs brought this suit as citizens who were demonstrating their opposition to abortion in a public forum. Thus, the court will concentrate solely on whether Defendants' confiscation of Plaintiffs' signs and Defendant Grove's arrest violated Plaintiffs' First Amendment rights of free speech, assembly, and free exercise of religion.

### i. Freedom of Speech

 The First Amendment protects speech and other expressive activity in public places. The degree of protection depends upon the type of forum at issue. *Hurley,* 515 U.S. at 572–73, 115 S.Ct. 2338; *Kreimer v. Bureau of Police,* 958 F.2d 1242, 1255–56 (3d Cir.1992). In a traditional public forum,[2] such as streets, parks and public sidewalks, which have long been considered places for public assembly and the communication of ideas, *Id.* at 1261, the government may only impose reasonable restrictions on the time, place and manner of the protected speech. *Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 761, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995). When these restrictions are content-based (that is, a restriction triggered by the speaker's message), they are typically subject to the highest degree of scrutiny, namely strict scrutiny, whereby the subject regulation may withstand constitutional review only if it is necessary and narrowly tailored to achieve a *compelling* public interest. *Id.; Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). By contrast, a content-neutral regulation of the time, place, and manner of speech conducted within a

---

**2.** There is no question between the parties that Plaintiffs' actions occurred in a traditional public forum. Plaintiffs were marching on

Market Street, which was closed to traffic at the time.

traditional public forum is evaluated with reference to the relaxed "intermediate scrutiny" standard, whereby a public restriction will survive constitutional assessment only if it is narrowly tailored to further a *significant* government interest, and it leaves open ample alternative channels of communication. *Id.*

The principal inquiry in determining content neutrality is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). "A regulation of speech that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* (citing *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–48, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986)). Moreover, government regulation of expressive activity is content neutral so long as it is "justified without reference to the content of the regulated speech." *Clark v. Cmty. for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).

■ In the captioned matter, the undisputed facts demonstrate that Defendants' actions were not content neutral. Defendants restricted Plaintiffs' speech by prohibiting Plaintiffs from carrying signs depicting aborted fetuses, while allowing Plaintiffs to keep those signs displaying scriptural exhortations against abortion. Plaintiffs presented ample evidence that Defendants' decision to prevent Plaintiffs from carrying their pictorial signs, and eventually confiscating them, was motivated by the signs' content. (*See* Tr. of Proceedings, Prelim. Hr'g at 37 (stating that Plaintiffs' other signs were not confiscated because "they weren't disturbing people"); Nestor Dep. at 14 ("[T]he problem we are having is the crowd is really ticked off right now about the signs, the posters. I

said, I'm sure if you could do something with them, get rid of them, hide them, whatever... you guys can continue on your way.").) Defendants suggest that the reason Hibner and Tschopp initially directed Plaintiffs' group to the sidewalk was due to the fact that they did not have a parade permit and were not part of the Parade, reasons that are content neutral. The validity of these reasons fails, however, upon an examination of the facts as a whole.

First, Defendant Hibner testified that she first noticed Plaintiffs when she observed that they were yelling to members of the crowd and that the crowd was shouting back at Plaintiffs. (Tr. of Proceedings, Pl. Grove's Crim. Trial at 90.) It was then that she radioed Defendant Tschopp who advised her to get Plaintiffs off the street. Second, Plaintiffs were informed that they could continue along the parade route uninterrupted if they would merely cover or surrender those signs depicting aborted fetuses. (*See* Nestor Dep. at 14.) Third, Defendants only confiscated those signs depicting aborted fetuses and then permitted Plaintiffs to continue along the Parade route uninterrupted while still carrying their textual signs. Finally, Defendant Tschopp admitted that Plaintiff Grove and other street preachers had walked along the Parade route on other occasions without a problem, but that the pictures of aborted fetuses were going too far. (*See* Tschopp Dep. at 14, 17.) These facts, taken in a light most favorable to Defendants, discredit Defendants' assertions that the reason for stopping Plaintiffs and confiscating their signs was based on the fact that Plaintiffs lacked a parading permit.

■ Defendants argue that it was not the content of the signs per se that caused Defendants to confiscate them, rather it was the effect that the pictorial signs had on the crowd and the potential for the

situation to escalate out of control. Defendants argue that because the pictorial signs were the "lightening rod" for the hostility being directed at Plaintiffs, Defendants were acting in manner that served a purpose unrelated to the content of Plaintiffs' expression. (*See* Br. in Supp. of Defs.' Mot. for Summ. J. at 9); *see also Ward*, 491 U.S. at 791, 109 S.Ct. 2746. That is, Defendants argue that their regulation of Plaintiffs' speech was justified without reference to the content of the speech and was, therefore, content neutral. Defendants' argument, however, is misplaced. The Supreme Court has stated that government regulation of speech or assembly activities, motivated by anticipated or actual listener reaction to the content of the communication is not content-neutral. *See Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134–36, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). Put simply, there is no heckler's veto to the First Amendment. Thus, Defendants' argument that they were concerned with the crowd's reaction to the content of Plaintiffs' signs does not shield Defendants from the court's finding that their actions were content-based.

It is clear, based on the foregoing, that Defendants' actions were content based. Other than arguing that the initial decision to remove Plaintiffs from the sidewalk was because they didn't have a permit, Defendants have offered no content-neutral basis for any of its decisions on the day of the Parade. Furthermore, as noted above, that argument fails given Defendants' later decision to permit Plaintiffs to continue along the Parade route after Defendants confiscated Plaintiffs' pictorial signs. Given that Defendants' actions were content-based, the court must apply strict scrutiny to determine if they were nonetheless justified because they were narrowly tailored to serve a compelling state interest.[3]

Defendants argue that their interest in maintaining public order is a compelling government interest and that, at the time, taking only those signs that caused the most controversy was narrowly tailored to meet that interest. Plaintiffs argue that under the facts of the captioned matter, Defendants did not have a compelling, or even a significant, government interest in maintaining the public order. In this regard, Plaintiffs cite to *Terminiello v. Chicago*, 337 U.S. 1, 3, 69 S.Ct. 894, 93 L.Ed. 1131 (1949).

In *Terminiello*, the plaintiff was convicted of disorderly conduct when he condemned an angry crowd of approximately 1000 people by criticizing various political and racial groups he viewed as inimical to the nation's welfare. The situation became riotous, ice picks, stones, and bottles were thrown at police and a number of windows were broken. *See id.* at 13–16, 69 S.Ct. 894 (Jackson, J., dissenting). The Supreme Court overturned the conviction reasoning that speech is protected "unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Id.* at 4, 69 S.Ct. 894. The court stated:

> [A] function of free speech under our system of government is to invite dis-

---

**3.** Even if the court were to find that Defendants' actions were content-neutral, a decision that the court cannot reach given the undisputed facts of the case, the court would nonetheless have to analyze whether the restrictions imposed by Defendants—the confiscation of Plaintiffs' signs and Defendants' refusal to allow Plaintiffs to march while holding the pictorial signs—were narrowly tailored to serve a significant government interest and left open ample alternative avenues for communication. Even under this more deferential standard, based on the court's finding that Defendants' actions were not narrowly tailored, *see infra* at 303–05, Defendants' actions would have nonetheless violated Plaintiffs' First Amendment rights.

pute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea.

*Id.* The undisputed facts in the captioned matter do not come close to those present in *Terminiello.* Up until the point that Plaintiffs were told to get off the street, there were no confrontations with the crowd other than a few hecklers. (*See* Grove Dep. at 13–14; Krone Dep. at 32.) It was not until Plaintiffs were on the sidewalk at the intersection of Market and Pine Streets that a few persons delivered threats and held sheets to block Plaintiffs' signs. (*See* Tschopp Dep. at 14–15.) This is far from riotous activity and does not "rise[ ] far above public inconvenience, annoyance, or unrest." *Terminiello,* 337 U.S. at 4, 69 S.Ct. 894. Thus, the court finds that, given the undisputed facts, Defendants' concern for public safety was merely pretextual and does not rise to the level of a compelling government interest. Even assuming, however, that Plaintiffs' concern for public safety, based on the facts at hand, did rise to the level of a significant or compelling government interest, Defendants' actions were not narrowly tailored to that interest.

Defendant Tschopp, who was the officer in charge at the Parade, admitted that there probably would not have been any verbal hostility if Plaintiffs would have been permitted to continue down Market Street with their signs. (*See* Tschopp Dep. at 24; *see also* Nestor Dep. at 18.) Again, apart from a few hecklers, prior to Plaintiffs being stopped at Pine and Mar-

ket Streets there was no evidence of any manner of hostility directed at Plaintiffs while they were carrying their pictorial signs. Defendants argue that by confiscating the offending signs they were acting in a narrowly tailored manner because they permitted Plaintiffs to keep the non-pictorial signs and continue on the Parade route, thus permitting Plaintiffs to continue speaking out against abortion and alleviating the major source of tension between Plaintiffs and the crowd. Defendants' reasoning is problematic.

■ Defendants are not permitted to place restrictions on speech that burdens substantially more speech than is necessary to further the government's interest. *Ward,* 491 U.S. at 799, 109 S.Ct. 2746. Here, there is no doubt that those signs displaying pictures of aborted fetuses were essential to Plaintiffs' message. The reaction of the crowd alone demonstrates that Plaintiffs' message, which, according to Plaintiffs, was intended to shock the public's conscious through the "display of human carnage," was effective while the signs were displayed. (Pls.' Mem. in Opp'n to Defs.' Mot. for Summ. J. at 8.) Defendants' decision to burden this aspect of Plaintiffs' speech, while other less burdensome avenues remained available, can hardly be seen as narrowly tailored. In addition to merely allowing Plaintiffs to proceed along the Parade route, Defendants could have called in additional officers to protect the peace, a solution they used at other events such as when white supremacists wished to speak. (*See* Tschopp Dep. at 9.) Given the foregoing, the court concludes that Defendants' actions were substantially broader than necessary and burdened more speech than necessary to maintain the peace. Consequently, Defendants' actions were not narrowly tailored.[4] Thus, taking the facts in

---

4. Given that the court has found that Defendants' restriction of Plaintiffs' speech was

content-based, the court need not examine

the light most favorable to Defendants, the court concludes that their action of confiscating Plaintiffs' pictorial signs was a content-based restriction on Plaintiffs' speech that was not narrowly tailored to meet a compelling government interest.

### ii. Freedom of Assembly

In addition to their free speech claims, Plaintiffs argue that being forced off the Parade route unless they surrendered their pictorial signs violated Plaintiffs' freedom of assembly rights under the First Amendment. Inexplicably, save their arguments regarding qualified immunity, Defendants do not respond to these allegations in either their motion for summary judgment or their brief in opposition to Plaintiffs' motion for summary judgment.

Plaintiffs argue that whether they must give up their pictorial signs as a condition of preaching as a group walking down a public street is a question of free of assembly. The difference between Plaintiffs' free speech claims and their free assembly claims is minimal. Both are predicated on Plaintiffs' inability to effectively deliver their message opposing abortion without the use of their pictorial signs. Plaintiffs were told that they had to get off the street under the pretext that they did not have a permit to march in the parade. While on the sidewalk at the corner of Market and Pine Streets, the crowd and Plaintiffs' group began exchanging heated remarks which centered on the appropriateness of Plaintiffs' pictorial signs. Defendants informed Plaintiffs that they could continue along the parade route on the condition that they surrendered those signs causing the hostilities. After refusing to surrender the signs, Defendants confiscated them and permitted Plaintiffs to continue marching the Parade route. Thus, as it pertains to Plaintiffs' free as-

whether there were available alternative channels of communication. *See Capitol Square Review and Advisory Bd.*, 515 U.S. at 761, 115 S.Ct. 2440 (stating that where there is a content-based regulation the court need only look whether the restriction was necessary and narrowly tailored to achieve a compelling public interest). However, even if the court were required to reach a conclusion on this issue, the court finds that ample alternative channels of communication were not available. Defendants point to three possible alternative channels of communication.

First, Defendants argue that Plaintiffs could have applied for their own parade permit and/or applied to participate in the Halloween Parade. This alternative is not as sufficient as marching in the Halloween Parade. It is doubtful that many people would come to watch a parade dedicated solely to anti-abortion protestors. Moreover, Defendants' suggestion that Plaintiffs could have applied for a permit to participate in the Halloween Parade is nothing short of disingenuous given that certain Plaintiffs did file an application to participate in the 2003 Halloween Parade and, although permitted to march, they were not permitted to carry or display signs picturing aborted fetuses. (*See* Grove Dep. at 68–

73; Krone Dep. at 52–53.) Certainly an alternative that does not allow Plaintiffs to display their pictorial signs is not an adequate alternative.

Second, Defendants argue that they in no way impeded and/or interfered with Plaintiffs' attempts to preach, distribute tracts, and display text signs displaying religious exhortations. As stated previously, Plaintiffs' pictures depicting aborted fetuses are some of Plaintiffs' most effective speech. As evidenced by the crowd's reaction, a text sign does not evoke the same response.

Finally, Defendants proffer that Defendant Tschopp offered to allow Plaintiffs to walk down the sidewalks of the parade route displaying their pictorial signs, but that Plaintiffs refused. Plaintiffs argue that this was not an adequate alternative since the crowd would no longer be looking at the pictures. Moreover, Plaintiffs argue that it was when they attempted to take Defendant Tschopp up on his offer to walk down the sidewalk that Defendants confiscated Plaintiffs' signs. Viewed as a whole, the court concludes that there were no alternative forums available to Plaintiffs.

sembly claims, Plaintiffs argue that Defendants' actions of confiscating the pictorial signs violated their assembly rights guaranteed by the First Amendment because they were effectively prohibited from gathering to deliver their message opposing abortion.

Whether it is a question of assembly or speech is immaterial to the court's analysis because both rights are fundamental, and given the court's finding *supra* that Defendants' restrictions were content-based, any deprivation of these rights can be upheld only if it passes strict scrutiny. *See NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 460–61, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) ("The right to peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental."). Under a strict scrutiny analysis, Defendants have the burden of demonstrating that their actions were narrowly tailored to advance a compelling state interest. As described in connection with Plaintiffs' speech claims, Defendants' actions were not narrowly tailored given that there were other viable alternatives available for Defendants to pursue that would have been less burdensome to Plaintiffs and equally as effective in keeping the peace. *See supra* at 304–05.

■ As the Supreme Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly, effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association. *See Thomas v. Collins,* 323 U.S. 516, 530, 65 S.Ct. 315, 89 L.Ed. 430 (1945); *DeJonge v. Oregon,* 299 U.S. 353, 364, 57 S.Ct. 255, 81 L.Ed. 278 (1937). The close nexus between these rights is also evidenced by the fact that an individual's freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the "liberty" assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech. *See Alabama ex rel. Patterson,* 357 U.S. at 460–61, 78 S.Ct. 1163. Here the two can't be separated. By confiscating Plaintiffs' pictorial signs, the Individual Defendants deprived Plaintiffs of their most effective speech and effectively prohibited Plaintiffs from gathering to deliver their message opposing abortion. Given that Defendants have advanced no argument other than that set forth regarding Plaintiffs' free speech claims, the court concludes that, under the undisputed facts, Defendants' actions violated Plaintiffs' First Amendment right to freedom of assembly.

### iii. Free Exercise of Religion

In addition to the rights mentioned above, Plaintiffs further argue that Defendants' decision to prohibit Plaintiffs from carrying and their later confiscation of Plaintiffs' pictorial signs, constitutes an impermissible violation of Plaintiffs' right to the free exercise of religion as protected by the First Amendment. As in the case of Plaintiffs' freedom of assembly claims, Defendants inexplicably do not address this issue.

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law ... prohibiting the free exercise [of religion]." U.S. Const. amend. I. As the Supreme Court noted, this clause means that individuals have the right to profess and believe whatever religious beliefs they desire. *See Employment Div., Dep't of Human Res. of Oregon v. Smith,* 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) ("The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires."). The "free exercise of religion" means more, however, than the protection of belief and profession of that belief.

[T]he "exercise of religion" often involves not only belief and profession but the performance of (or abstention from) physical acts: assembling with others for a worship service, participating in the sacramental use of wine and bread, proselytizing, abstaining from certain foods or certain modes of transportation. It would be true, we think ... that a State would be "prohibiting the free exercise [of religion]" if it sought to ban such acts or abstentions only when they are engaged in for religious reasons, or only because of the religious belief that they display. It would doubtless be unconstitutional, for example, to ban the casting of "statues that are to be used for worship purposes," or to prohibit bowing down before a golden calf.

*Id.* at 877–78, 110 S.Ct. 1595.

In the instant case, Plaintiffs argue that their preaching against abortion is not only speech, but is also a sincerely held religious belief that constitutes the exercise of religion. Thus, Plaintiffs argue that by prohibiting Plaintiffs from carrying and later confiscating Plaintiffs' pictorial signs, Defendants were placing an unconstitutional burden on Plaintiffs' exercise of their sincerely held religious beliefs. Plaintiffs further argue that heightened scrutiny applies to these claims because the instant case presents a hybrid situation involving not only the exercise of Plaintiffs' religious beliefs, but also their free speech and assembly rights.

■ As an initial matter, Defendants do not challenge that Plaintiffs' sincerely held religious beliefs compel them to speak out on what they describe as the "sin of abortion." (Mem. in Supp. of Pls.' Mot. for Summ. J. at 18.) It is also apparent from the undisputed facts that Defendants' actions were not facially motived by any desire to limit Plaintiffs' free exercise of religion. That is, it is likely that Defendants would have acted in the same manner regardless of whether Plaintiffs' actions were motivated by their religious beliefs or whether they were motivated by an agnostic regard for the welfare of the unborn. The evidence in the instant case points to Defendants' concern with the effect Plaintiffs' message had on the crowd and the manner Plaintiffs choose to convey their message, not the beliefs that motivated Plaintiffs' speech. That being said, the government may not burden conduct motivated by a sincerely held religious belief unless the government acts by the least restrictive means to further a compelling state interest. *Sherbert v. Verner,* 374 U.S. 398, 403–07, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). Furthermore, where a free exercise claim is combined with "a colorable showing of infringement of recognized and specific constitutional rights" heightened scrutiny applies. *Smith,* 494 U.S. at 881, 110 S.Ct. 1595; *see also Wisconsin v. Yoder,* 406 U.S. 205, 207, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). The instant matter is a hybrid situation in which heightened scrutiny applies.

■ Here, the undisputed facts demonstrate that Defendants' decision to prohibit Plaintiffs from carrying pictorial signs and the later confiscation of those signs was a content-based restriction of Plaintiffs' free speech rights. *See supra* Part III.A.i. It is also undisputed that Plaintiffs' sincerely held religious beliefs compel them to preach publicly "in order to make the public aware of sin, including the sin of Halloween and of abortion." (Pls.' Sep. Stat. of Mat. Facts ¶ 3.) Furthermore, the court found that Defendants' interest in maintaining the peace arguably rose to the level of a compelling interest, but that the means chosen to carry out that interest, namely confiscating Plaintiffs' pictorial signs, was not narrowly tailored. *See supra* Part III.A.i. at 19–20. Given this background and the fact that Defendants

do not dispute that Plaintiffs' actions were motivated by their sincerely held religious beliefs, the court finds that Defendants' actions violated Plaintiffs' First Amendment free exercise rights.

### iv. Plaintiff Grove's Arrest

█ Plaintiff Grove argues that his First Amendment free speech rights were also violated by Defendants filing criminal charges against him. Third Circuit case law makes it clear that the filing of criminal charges without probable cause and for reasons of personal animosity is actionable under § 1983. *See Losch v. Borough of Parkesburg, Pa.,* 736 F.2d 903, 907–08 (3d Cir.1984); *see also Patzig v. O'Neil,* 577 F.2d 841, 848 (3d Cir.1978). In response, Defendants argue that Defendant Tschopp had probable cause to arrest Grove on a disorderly conduct and harassment charge. Plaintiffs contend that an examination of the criminal statutory provisions at issue and their interpretation in Pennsylvania could not lead a reasonable police officer to conclude that they were applicable to Grove. Specifically, Grove references the disorderly conduct statute, 18 Pa. Cons. Stat. § 5503 which provides, in relevant part:

A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:

(1) engages in fighting or threatening, or in violent or tumultuous behavior;

(2) makes unreasonable noise;

(3) uses obscene language, or makes an obscene gesture; or

(4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.

An offense under this section is a misdemeanor of the third degree if the intent of the actor is to cause substantial harm or serious inconvenience, or if he persists in disorderly conduct after reasonable warning or request to desist. Otherwise disorderly conduct is a summary offense.

Plaintiffs argue that because they were engaged in speech within a traditional public forum, Grove could not be arrested under this statute unless his activities produced "a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Terminiello,* 337 U.S. at 4, 69 S.Ct. 894. Moreover, Plaintiffs argue that Defendants' real concern was not with the Parade route since Plaintiffs were allowed to continue on that route once their signs were confiscated, but rather Defendants had a problem with the content of Plaintiffs' signs.

Defendants on the other hand, point to Defendant Tschopp's affidavit of probable cause which states that he advised Plaintiffs that they were violating City parade ordinances; asked Grove to stop his parade and advised him that the display of signs depicting aborted fetuses was causing public annoyance and alarm; and finally, that Plaintiffs failed to get onto the sidewalk when asked. (*See* Br. in Supp. of Defs.' Mot. for Summ. J. at 10.) Defendants further argue that Tschopp "attempted to reason with Rev. Grove and explained to him that he was not allowed to be on the enclosed parade route, but his behavior and the behavior of others in his group was disorderly and harassing (signs were being shoved into peoples [sic] view and traps [sic] were thrown into the laps of individuals who did not want them)." (*Id.* at 11; *see also* Tr. of Proceedings, Pl. Grove's Crim. Trial at 100, 122–23.) Plaintiffs admit that the affidavit of probable cause states the foregoing, but deny that they were being disorderly and harassing, and specifically deny that they were shoving signs in people's faces or handing out

literature to people who did not want any. (*See* Pls.' Answer to Defs.' Concise Stat. of Mat. Facts ¶¶ 30, 33.) Plaintiffs also deny that they failed to get onto the sidewalk when they were told to do so. (*See id.* ¶ 29.)

■ ·The foregoing demonstrates that as to certain averments contained in the affidavit of probable cause, there are genuine issues of material fact. Specifically, the contradictions raised by the parties is a credibility issue that must be determined by a jury, not by the court on summary judgment. While summary judgment may be based on affidavits, none were provided in the instant case, and in any event, conflicts of credibility should not be resolved on summary judgment "unless the opponent's evidence is too incredible to be believed by reasonable minds." *Losch,* 736 F.2d at 909 (quotation omitted). Here, Defendants' substantive liability on this issue depends on the reasonableness of Defendants' probable cause determination, which, in turn, depends upon a credibility determination regarding the events during the Halloween Parade. In the Third Circuit, "the reasonableness of defendants' probable-cause determination is for the jury." *Id.; see also Patzig,* 577 F.2d at 848. Thus, the court will deny both parties' motions for summary judgment on this issue.

### B. *Qualified Immunity; The Individual Defendants*

■ In their Answer to Plaintiffs' Second Amended Complaint, the Individual Defendants assert a qualified immunity defense to Plaintiffs' claims. Defendants re-assert that defense on summary judgment. Qualified immunity works as an absolute bar to trial. *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Under this doctrine, local government employees are shielded from suits for civil damages brought pursuant to § 1983 so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The threshold inquiry in a qualified immunity analysis is whether the facts demonstrate that the officials' conduct violated a constitutional right. *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). If no constitutional right was violated, the inquiry ends. *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). If a constitutional right was violated, however, then the relevant inquiry becomes whether that right was clearly established at the time and it would be clear to a reasonable police officer that his conduct was unlawful in the situation he confronted. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

■ In order for a right to be clearly established depends "largely upon the level of generality at which the relevant 'legal rule' is to be identified." *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). For the purposes of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640, 107 S.Ct. 3034. While this does not mean that an official's action is protected by qualified immunity unless the very action has previously been ruled unlawful, it suggests that "in light of the pre-existing law the unlawfulness [of the activity] must be apparent." *Id.* That is, the right that was violated must be defined at the appropriate level of specificity before the court can determine if it was clearly established. *Wilson,* 526 U.S. at 615, 119 S.Ct. 1692 (citing *Anderson,* 483 U.S. at 641, 107 S.Ct. 3034). In the captioned

matter, the court has already determined that the Individual Defendants' conduct violated Plaintiffs' First Amendment rights to free speech, free assembly and free exercise of religion. Thus, the relevant inquiry is whether it would be clear to a reasonable police officer that Defendants' conduct of prohibiting Plaintiffs from marching in the parade with signs depicting aborted fetuses and confiscating those signs because of the crowd's reaction violated Plaintiffs' First Amendment rights.

■■■ As to Plaintiffs' free speech rights, at the time Defendants' prohibited Plaintiffs from marching any further with their pictorial signs and confiscated those signs, it was clearly established that these actions violated Plaintiffs' free speech rights unless to do so was narrowly tailored to meet a compelling government interest. *See Perry Educ. Ass'n*, 460 U.S. at 45, 103 S.Ct. 948 (stating that when restrictions are content-based, that is, a restriction triggered by the speaker's message, they are typically subject to strict scrutiny, whereby the restriction may withstand constitutional review only if it was necessary and narrowly tailored to achieve a compelling public interest). Furthermore, it was clear that even assuming Defendants' concern for public safety rose to the level of a significant or compelling government interest, Defendants' actions were not narrowly tailored to that interest. Thus, given the undisputed facts, the court concludes that a reasonable officer would have known that confiscating Plaintiffs' signs was not the most narrowly tailored manner of handling the hostilities that occurred between Plaintiffs and the crowd. This is especially true in light of the fact that, apart from a few hecklers, there were no altercations between the crowd and Plaintiffs as they walked the Parade route prior to being ushered to the sidewalk by Defendants.

Defendants argue that a reasonable police officer would have concluded that Plaintiffs could have lawfully been excluded from the Parade route because they did not have a permit to parade. This argument is a red herring. The undisputed facts demonstrate that Defendants permitted Plaintiffs to continue parading once the pictorial signs were confiscated. Thus, the issue was never whether Plaintiffs possessed the required permits, but rather that their speech was causing controversy with the Parade onlookers. However, as the court stated previously, the Supreme Court has dictated that government regulation of speech or assembly activities, motivated by anticipated or actual listener reaction to the content of the communication is not content-neutral. *See Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134–36, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). This principle was clearly established at the time Defendants acted.

■■■ It is similarly clear that a reasonable police officer would be aware that his actions violated Plaintiffs' assembly and free exercise rights. As it pertains to Plaintiffs' free assembly claims, Plaintiffs argue that Defendants' actions of confiscating the pictorial signs violated their assembly rights guaranteed by the First Amendment because they were effectively prohibited from gathering to deliver their message opposing abortion. As to their free exercise claims, Plaintiffs argue that by prohibiting them from carrying and by later confiscating Plaintiffs' pictorial signs, Defendants were placing an unconstitutional burden on Plaintiffs' exercise of their sincerely held religious beliefs. Both of these claims were clearly established at the time Defendants acted. It is clear that a government actor may not infringe upon free assembly rights absent a compelling government interest and, then, only to the extent that its action is narrowly tailored to that interest. *See Alabama ex rel. Pat-*

*terson,* 357 U.S. at 460–61, 78 S.Ct. 1163 (stating that it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to assemble is subject to the closest scrutiny). The same is true under the free exercise clause. *See Sherbert,* 374 U.S. at 403–07, 83 S.Ct. 1790 (stating that the government may not burden conduct motivated by a sincerely held religious belief unless the government acts by the least restrictive means to further a compelling state interest). Again, the undisputed facts demonstrate that a reasonable police officer would have known that confiscating Plaintiffs' signs was not the most narrowly tailored manner of handling the hostilities that occurred between Plaintiffs and the crowd. A reasonable police officer also would have known, given that Plaintiffs were on a public street, that doing so would violate Plaintiffs' rights to free assembly and effectively communicate their message. Finally, a reasonable police officer would have known, given that many of Plaintiffs' other signs contained scriptural exhortations and that Plaintiff Grove introduced himself as a Reverend, that Plaintiffs were acting out of their sincerely held religious beliefs and that confiscating Plaintiffs' signs would violate Plaintiffs' free exercise rights.

In summary, a reasonable police officer faced with the facts confronted by Defendants would have known that confiscating Plaintiffs' pictorial signs, given the other available alternatives, was a violation of Plaintiffs' First Amendment free speech, free assembly and free exercise rights. Consequently, the Individual Defendants are not entitled to qualified immunity.

### C. *The City of York: Monell Liability*

■■■■■ The parties dispute whether Defendant City is liable under § 1983. In *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue. "It is only when the execution of the government's policy or custom ... inflicts the injury that the municipality may be held liable under § 1983." *Springfield v. Kibbe,* 480 U.S. 257, 267, 107 S.Ct. 1114, 94 L.Ed.2d 293 (1987) (O'Connor, J., dissenting) (quotations omitted). Municipal liability cannot be based on a theory of *respondeat superior* or any other theory of vicarious liability. *Monell,* 436 U.S. at 694–95, 98 S.Ct. 2018.

■■■■■ For municipal liability to attach under § 1983, Plaintiffs must "identify a municipal 'policy' or 'custom' that caused the plaintiff[s'] injury." *Bd. of County Comm'rs, Bryan County v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

> Policy is made when a decision maker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict. A course of conduct is considered to be a "custom" when, though not authorized by law, such practices of state officials [are] so permanent and well-settled as to virtually constitute law.

*Beck v. City of Pittsburgh,* 89 F.3d 966, 971 (3d Cir.1996) (quotations omitted). The Supreme Court expanded *Monell* in *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) to include claims for inadequate police training. To recover under a failure to train theory, the plaintiff must demonstrate that (1) the failure to train amounted to a deliberate indifference to the rights of persons with whom the police came in contact and (2) the municipality's policy

actually caused a constitutional injury. *Id.* at 389–90, 109 S.Ct. 1197. To constitute deliberate indifference, the failure to train must reflect a deliberate or conscious choice made by municipal policymakers. *Id.*

In the instant case, Defendants argue that Plaintiffs have failed to adduce evidence demonstrating that the City had a policy, practice, or custom of violating the First Amendment rights of abortion protestors. Defendants further argue that Plaintiffs have failed to demonstrate that the City inadequately trained its police officers on First Amendment issues.

Plaintiffs, on the other hand, argue that the City is liable because Chief Hill's failure to investigate constitutional deprivations demonstrates a policy of deliberate indifference and a custom of acquiescence to wrongdoing.[5] Plaintiff also argues that by authorizing the filing of criminal charges, through Chief Hill, the City ratified the unconstitutional actions of the Individual Defendants. Finally, Plaintiffs argue that the undisputed facts demonstrate that the City failed to adequately train the Individual Defendants. The court will address each of these issues in turn.

### i. Failure to Investigate

It is beyond dispute that Chief Hill is a policy maker whose actions could cause liability to inure to Defendant City. *See Beck*, 89 F.3d at 973 n. 3 (stating that liability can attach against Pittsburgh through the actions of the police commissioner because he is a policy maker); *see also Andrews*, 895 F.2d at 1481 (stating that liability can attach against Philadelphia when the police commissioner ac-

quiesced to unconstitutional behavior); *Black v. Stephens*, 662 F.2d 181, 191 (3d Cir.1981) (stating that liability against Allentown can attach due to the actions of the police chief because he has final authority within the police force and he is in the Mayor's cabinet). Given this background, Plaintiffs argue that liability attaches to the City based on Hill's failure, as the City policy maker, to investigate the violations of Plaintiffs' constitutional rights.

■ Shortly after the Parade, an attorney representing Plaintiffs' interests sent a letter to the mayor of the City and Chief Hill asking Defendants to publicly apologize for their actions and to return Plaintiffs' signs. (*See* Hill Dep. at 23–24.) Despite receiving this letter, Chief Hill did not consider the allegations important and took no corrective actions and did not initiate an investigation. (*See id.* at 24–26.) The court fails to see how Chief Hill's failure to investigate Plaintiffs' claims constitutes a violation of Plaintiffs' constitutional rights. In *St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), the Supreme Court provided the following framework for determining whether a policymaker's acquiescence to a subordinate's decision is sufficient "policy" to hold the government entity liable:

> Simply going along with discretionary decisions made by one's subordinates ... is not a delegation of them of the authority to make policy. It is equally consistent with a presumption that the subordinates are faithfully attempting to comply with the policies that are supposed to guide them. It would be a

---

**5.** Plaintiff also argues that the City is liable because of the Mayor's failure to investigate Plaintiffs' claim that their constitutional rights were violated. However, other than alleging that Mayor Brenner received Attorney Brown's letter following the 2002 Halloween Parade, Plaintiffs do not provide any evidence suggesting that Mayor Brenner took any action that would create a policy or custom on the part of the City. Moreover, as demonstrated more fully below, the Mayor's failure to investigate on this one occasion is insufficient to create municipal policy and custom. *See infra* at 313–14.

different matter if a particular decision by a subordinate was cast in the form of a policy statement and expressly approved by the supervising policy maker. It would also be a different matter if a series of decisions by a subordinate official manifested a "custom or usage" of which the supervisor must have been aware. In both of those cases, the supervisor could realistically be deemed to have adopted a policy that happened to have been formulated or initiated by a lower ranking official. *But the mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policy making authority* . . . .

*Id.* at 130, 108 S.Ct. 915 (emphasis added). Applied to the captioned matter, *Praprotnik* requires more on the part of Chief Hill than the mere failure to investigate the discretionary decisions of the Individual Defendants in order for the court to conclude that their actions constitute municipal policy. Plaintiffs merely provided evidence of Chief Hill's failure to act on the representations made by Plaintiffs' counsel. This is insufficient to create municipal liability. Plaintiffs cannot hang the City's liability on the coattails of the Individual Defendants' actions. Evidence of nothing more than the acts of the Individual Defendants is not evidence of municipal policy. *See Board of County Comm'rs.*, 520 U.S. at 407, 117 S.Ct. 1382 ("That a plaintiff has suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation; the plaintiff will simply have shown that the employee acted culpably."). Having shown that the Individual Defendants were culpable of violating their rights, Plaintiffs are attempting to bootstrap municipal liability under a theory of acquiescence. Fatal to their claim, however, is Plaintiffs' failure to produce evidence of any policy or custom by the City itself.

Even if it could be said that Plaintiffs demonstrated a policy of acquiescence to the Individual Defendants' unconstitutional acts, Plaintiffs have failed to demonstrate that Chief Hill's failure to investigate caused Plaintiff any harm. Like cases involving constitutional injuries allegedly traceable to an ill-considered hiring, those involving mere allegations of a failure to investigate "pose the greatest risk that a municipality will be held liable for an injury that it did not cause . . . . Where a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability." *Bd. of County Comm'rs*, 520 U.S. at 415, 117 S.Ct. 1382. Thus, standing alone, Chief Hill's failure to investigate the basis for the Individual Defendants' discretionary decisions does not amount to a policy, practice or custom of the City. Accordingly, the court will deny Plaintiffs' motion for summary judgment as to this issue. For the same reasons, the court will grant Defendants' motion on this issue.

### ii. Initiation of Criminal Charges

Plaintiffs also argue that the City is liable for violating Plaintiff Grove's First Amendment rights because Chief Hill directed Tschopp to file criminal charges against Grove. Unlike Plaintiffs' claims that Chief Hill's mere failure to investigate the Individual Defendants' wrongdoing constitutes a municipal decision to violate Plaintiffs' rights, Plaintiffs present evidence that Chief Hill directed Tschopp to file charges against Plaintiff Grove, a fact that, if believed by the jury, could implicate municipal policy making. As the Supreme Court stated in *Board of County Comm'rs:*

> [P]roof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted cul-

pably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

520 U.S. at 405, 117 S.Ct. 1382.

■ Here, Plaintiffs presented uncontested evidence that Tschopp consulted Chief Hill prior to filing criminal charges. (Tschopp Dep. at 5.) Hill also directed Tschopp to file the charges that the District Attorney's office suggested, (see Hill Dep. at 27), even though he knew that only those signs containing pictures of aborted fetuses were taken, (see id. at 23–24), and even though he was told that the signs were taken because persons in the crowd were offended, (see id. at 32). Whether these actions evidence that the City, through Chief Hill, intentionally violated the constitutional rights of Plaintiff Grove turns on whether the initiation of charges itself violated Plaintiff Grove's rights, which, as noted in Part III.A.iv. supra, depends on the reasonableness of Defendants' probable cause determination, which, in turn, depends upon a credibility determination regarding the events that took place during the Parade. These are all issues for the finder of fact, not the court on summary judgment. In the Third Circuit, "the reasonableness of defendants' probable-cause determination is for the jury." Losch, 736 F.2d at 909; see also Patzig, 577 F.2d at 848. That is, if the jury concludes that Defendants' initiation of charges violated Grove's constitutional rights, then, given the undisputed fact that Chief Hill, as a City policy maker, directed these charges to be filed, the City is also liable for deliberately choosing a course of action that caused Grove's constitutional injury. Thus, the court will deny both parties' motion for summary judgment as to this issue.

### iii. Failure to Train

In addition to the foregoing, Plaintiffs allege that the City was deliberately indifferent in training its police officers to handle free speech issues and that this action caused the Individual Defendants to violate Plaintiffs' First Amendment rights during the 2002 Halloween Parade. Predictably, Defendants argue that Plaintiffs have presented no evidence demonstrating that the City failed to adequately train and/or supervise its police officers on issues of the First Amendment.

Like all other claims of municipal liability under § 1983, Plaintiffs must show that the City was deliberately indifferent to the First Amendment rights of Plaintiffs. Simmons v. City of Philadelphia, 947 F.2d 1042, 1062 (3d Cir.1991). It is not enough to show that one or a few of the City's police officers are inadequately trained. Rather, the salient issue is whether the City's training program is adequate, and if not, the question becomes whether such inadequate training can justifiably be said to represent "city policy." Harris, 489 U.S. at 390, 109 S.Ct. 1197. In the context of a failure to train claim, Plaintiffs must demonstrate "that a municipality's policymakers were put on notice, whether actually or constructively, of the need for a different policy before they can be found to be deliberately indifferent to that need." Jones v. Chieffo, 833 F.Supp. 498, 510 (E.D.Pa.1993). Plaintiffs must also demonstrate "a pattern of similar incidents in which citizens were injured." Carroll v. Borough of State Coll., 854 F.Supp. 1184, 1197 (M.D.Pa.1994). "A single prior incident is insufficient as a matter of law to establish liability on the part of the municipality to take preventative action." Id. at 1197–98. Thus, "in the absence of any unconstitutional statute or rule, it is the Plaintiffs' burden to articulate a factual basis that demonstrates considerably more

proof than a single incident." *House v. New Castle County,* 824 F.Supp. 477, 486 (D.Del.1993) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

In the captioned matter, Plaintiffs argue that Defendant City failed to adequately train its police officers even after it was on notice of the need to do so. Specifically, Plaintiffs point to a letter sent in June 2002 from Attorney Brown to Chief Hill requesting that City police officers receive training regarding the protection of unpopular messages regarding abortion. Plaintiffs also point to Attorney Brown's October 2002 letter *after* the incidents of the 2002 Halloween Parade as notice of the need to train City police officers. Finally, Plaintiffs cite to the City's actions during the 2003 Halloween Parade, where the City, through its solicitor, informed Plaintiff Grove that despite possessing a parading permit he would not be permitted to march in that parade with pictures of aborted fetuses. The problem with Plaintiffs' argument is that absent the letter from Attorney Brown in June of 2002, there is no indication that prior to the 2002 Parade the City's First Amendment training program was inadequate, and the June 2002 letter is insufficient to demonstrate a municipal policy. *See House,* 824 F.Supp. at 486 ("[I]n the absence of any unconstitutional statute or rule, it is the Plaintiffs' burden to articulate a factual basis that demonstrates considerably more proof than a single incident.").

 It is undisputed that all of the Defendants in the captioned matter completed state mandated training, which included training on First Amendment issues. Plaintiffs have not pointed to any incidents prior to the 2002 Halloween Parade that demonstrate a pervasive pattern of inadequate training in the area of protecting First Amendment rights. In fact, Plaintiffs have presented evidence that in the past they were permitted to march during the Halloween Parade without incident. (*See* Nestor Dep. at 15; Tr. of Proceedings, Pl. Grove's Crim. Trial at 340.) This fact alone tends to undercut Plaintiffs' argument that the problems stem from inadequate training as a whole rather than the Individual Defendants failure, in this case, to adequately safeguard Plaintiffs' First Amendment rights. Because no proof of deliberate indifference has been presented, the court will grant Defendants' motion for summary judgment as to this issue. For the same reasons, the court will deny Plaintiffs' motion for summary judgment on this issue.

### D. *Summary of Liability*

Based on the foregoing, the court finds that the only genuine issues of material fact surrounding the events during the 2002 Halloween Parade are (1) whether Plaintiffs' shoved their signs into the faces of individuals in the crowd, (2) whether Plaintiffs refused to get onto the sidewalk when they were ordered to do so by the Individual Defendants, and (3) whether Plaintiffs were distributing literature to individuals who did not want any. These disputes impact the reasonableness of Defendants' probable cause determination for arresting Plaintiff Grove. Furthermore, given that there is undisputed evidence that Police Chief Hill directed Defendant Tschopp to file the criminal charges at issue, the reasonableness of Defendants' probable cause determination also effects Defendant City of York's liability.

Other than the aforementioned, there are no genuine issues of material fact. The remaining undisputed facts, however, lend themselves to different conclusions for each set of Defendants. As to the Individual Defendants, the undisputed facts demonstrate that their decision to prohibit Plaintiffs from carrying and later

confiscating those signs depicting aborted fetuses was a content-based restriction on Plaintiffs' First Amendment rights. Furthermore, Defendants have come forth with no evidence suggesting that confiscating these signs was narrowly tailored to their stated interest in maintaining public order. Consequently, the court finds that Plaintiffs are entitled to judgment as a matter of law on the issue of the Individual Defendants' liability for prohibiting Plaintiffs from carrying and later confiscating their pictorial signs.

On the other hand, the undisputed facts demonstrate that, with exception to the issue of Plaintiff Grove's arrest as discussed above, the City of York is entitled to judgment as a matter of law. Plaintiffs' failure to train claim fails as a matter of law because Plaintiffs produced no evidence of a pervasive failure on the part of the City to train its police officers to protect the First Amendment rights of protestors.

### IV. *Conclusion*

In accordance with the foregoing, the court will grant in part and deny in part Plaintiffs' motion for summary judgment. The court will also grant in part and deny in part Defendants' motion for summary judgment. Given the current disposition, it is necessary for the parties to proceed to trial on the following: (1) whether Defendants' arrest of Plaintiff Grove violated Plaintiff Grove's First Amendment rights, and (2) the amount of damages Plaintiffs' suffered as a consequence of the Individual Defendants violating Plaintiffs' First Amendment rights by prohibiting Plaintiffs from carrying and later confiscating those signs depicting aborted fetuses.

Although Plaintiffs have prevailed on the merits of their claims against the Individual Defendants, it would not be prudent for the court to address Plaintiffs' request for a permanent injunction or a declaratory judgment at this stage. The court will address these issues after a jury trial on the foregoing issues. Furthermore, given that Plaintiffs have partially prevailed on the merits of their claims, they are entitled to a partial claim for reasonable attorney's fees, which the court will similarly entertain at the conclusion of the jury trial. An appropriate order will issue.

### *ORDER*

In accordance with the accompanying memorandum, **IT IS HEREBY ORDERED THAT:**

(1) Plaintiffs' Motion for Summary Judgment (Doc. 48) is **GRANTED in part and DENIED in part** as follows:

(a) Plaintiffs' motion is **GRANTED** as to Plaintiffs' claims against Defendants Tschopp, Hibner, Lowe, and Nestor for violating Plaintiffs' First Amendment rights during the 2002 Halloween Parade by prohibiting Plaintiffs' from carrying and later confiscating those signs depicting aborted fetuses.

(b) Plaintiffs' motion is **DENIED** in all other respects.

(2) Defendants' Motion for Summary Judgment (Doc. 47) is **GRANTED in part and DENIED in part** as follows:

(a) Defendants' motion is **GRANTED** as to all of Plaintiffs' claims against the City of York with the exception of those claims arising out of Plaintiff Grove's arrest.

(b) Defendants' motion is **DENIED** in all other respects.

(3) The parties shall proceed to trial on the following:

(a) Whether Defendants' arrest of Plaintiff Grove violated Plaintiff Grove's First Amendment rights, and

(b) The amount of damages Plaintiffs suffered as a consequence of the Individual Defendants violating Plaintiffs' First

Amendment rights by prohibiting Plaintiffs from carrying and later confiscating those signs depicting aborted fetuses.

(4) Jury Selection in the caption matter is scheduled for Tuesday, September 7, 2004 in Courtroom 3, Eighth Floor, Federal Building, Harrisburg, Pennsylvania. Trials will commence following the completion of jury selections. Counsel should note that criminal matters take priority and may delay the beginning of the civil trial list. Counsel may contact the court one week prior to the scheduled jury selection to determine the approximate starting date. However, counsel should be aware that the trial list may change drastically; therefore, counsel shall be prepared to go to trial at any point during the trial term.

(5) A pretrial conference will be held on Friday, August 20, 2004 at 9:00 a.m. in the chambers of Courtroom No. 3, Eighth Floor, Federal Building, Third and Walnut Streets, Harrisburg, Pennsylvania. *Counsel as well as litigants must be present at this conference in order to have effective settlement discussions.*

(6) Motions *in limine* **and** supporting briefs shall be filed no later than July 23, 2004. Responses are due no later than August 2, 2004. Replies are due no later than August 6, 2004.

(7) Pretrial memorandum are due by no later than August 13, 2004.

(8) The Clerk of Court shall defer entry of judgment until further order of the court.